**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**BERENICE GREENLAW DEANES**                                      **PLAINTIFF**

**v.**                                              **CAUSE NO.: 1:11-CV-198-SA-DAS**

**NORTH MISSISSIPPI STATE HOSPITAL**                          **DEFENDANT**

## MEMORANDUM OPINION

Plaintiff Berenice Greenlaw Deanes claims she was terminated from her position as a nurse with the North Mississippi State Hospital due to her race. Before the Court is Defendant's Motion for Summary Judgment [33]. After considering the motion, response, authorities, and summary judgment record, the Court is prepared to rule.

### BACKGROUND FACTS & PROCEDURAL HISTORY

Deanes (a black female) began working for the North Mississippi State Hospital (NMSH) in 2008. NMSH serves patients with mental and emotional problems. Deanes was hired by Executive Nurse Jan Botts (a white female). Botts evaluated Deanes twice during her employment and on both occasions gave her "excellent marks." On the night of June 21, 2009, Deanes was involved in an incident with Jane Doe,[1] a 19-year old female patient.

According to Deanes, she was informed by another nurse that Patient Doe had not taken her medication. Deanes attempted to get Doe to take her medication, but Doe refused. Doe began to use profanity and "get loud." Doe grabbed Deanes by her arms and tried to pull Deanes to the floor. Deanes put her arms on the patients arms and began "walking" her backwards toward a couch. Deanes described the events as:

At the time I remember taking my arms and putting them on top of my hands and

---

[1]The patient's name has been redacted to protect medical privacy.

> putting them on top of her arms. And she was pulling me all at the same time. And there was struggle because she was struggling. She was using all her force to try and get me down. And so I remembered us getting to the couch. And I remember hitting my knee on the wood part of the couch. And she sat down on the couch. When she sat down on the couch, she released me and I fell backwards from the couch.

Doe then got off the couch and tried to grab Deanes again. Deanes stood with her arms out, "elbows locked," and asked Doe to respect her personal space. Doe ran towards Deanes and into her outstretched hands, which caused her to fall backwards.

Campus police officer Kerry Whitten was the only witness to the incident aside from Deanes and Doe. Whitten observed at least a portion of the incident on a video monitor. After Doe had been taken back to her room, Whitten told the nurse in charge, Kathy Gilmore, that he saw Deanes push Doe down on the couch. Gilmore contacted Botts and reported what Whitten had told her. Botts in turn contacted David Ledbetter, NMSH's Director of Risk Management, to conduct an investigation into the incident.

The NMSH employee handbook provides:

> Under no circumstance will an employee strike, shove, pinch, engage in sexual acts, neglect or otherwise subject any consumer to violent treatment, verbal abuse or exploitation.

> Any employee witnessing or having suspicion of any mistreatment, violence, threat, neglect, exploitation, physical abuse, sexual abuse or verbal abuse must report the incident immediately. If an immediate report is not possible, the employee must report the incident not later than the end of the shift. Failure to report the offense to proper authorities is considered a Group III offense.

> Consumer abuse and neglect are very serious offenses and will result in immediate removal from the workplace or termination. Further, such actions will lead to prosecution to the fullest extent of the law.

On June 22 and 23, Ledbetter interviewed and obtained statements from Whitten, Gilmore, Doe, as well as others employees who were present at the hospital on the night of the incident.

However, he was unable to obtain a statement from Deanes because she was out of town attending a seminar. At Ledbetter's direction, Botts contacted Deanes on June 23, 2009 and asked her to prepare a written statement regarding what occurred.[2] Deanes prepared a statement containing her account of the incident on June 24. However, Ledbetter completed his investigation and prepared an investigative report prior to receiving Deanes' statement.

In Gilmore's written statement, she states that after the incident occurred, Whitten told her, "Well, I was watching the security camera and I saw [Deanes] push [Doe] down on the couch pretty hard." In Whitten's written statement, he does not state that he saw a push, but states that "I turned around and saw on the women's unit camera [Deanes] and [Doe]. [Deanes] had both hands up and the same time [Doe] was falling backwards on the couch." However, Ledbetter testified that when he interviewed Whitten regarding the discrepancy between his written statement and what he told Gilmore, Whitten told him that "there was no question that the patient was pushed back," that he observed Deanes make a "pushing motion," and "she put her hands up, she pushed out, the patient went back over the couch." Whitten also stated in his deposition that he told Ledbetter and Gilmore that Deanes had pushed Doe. However, when pressed in his deposition, Whitten admitted that he did not actually see the "push," only the "aftermath." Whitten testified:

> A: No, I didn't actually see the push but I saw what [sic] the patient landed on the couch and Ms. Deanes standing in front of her.
> Q: You have no idea whether or not – you have no idea what happened, what had occurred prior to – prior to seeing the patient falling on the couch, you have no idea what happened previous to that, do you?
> A: Nope.
> Q: You don't know whether or not the patient was out of control, do you?
> A: No, I don't.
> Q: I mean, do the nurses have a right to defend themselves?

---

[2]Aside from this, Botts was not involved in the investigation.

| | |
|---|---|
| A: | Not to push or shove patients in a violently [sic] manner to cause them to fall back like that, no. |
| Q: | Did she push the patient in a violent manner? |
| A: | From the way she hit the couch that's what it looked like. |
| Q: | Could the patient have ran into her outstretched arms and fall backwards on her own momentum? |
| A: | I don't believe so, no. |

Ledbetter prepared a three page investigative report summarizing the statements and interviews. Ledbetter's report states that "Whitten . . . observed RN Deanes push patient away causing patient to land on a sofa that was directly behind her" and "Whitten told RN Gilmore 'I was watching the security camera and I saw [Deanes] push [Doe] down on the couch pretty hard, so I though I better come over.'" The report also recounts Ledbetter's interview with Doe, who told him that "I don't feel good because the nurse push [sic] me down on the couch Sunday night and I hit my head on the wooden end."

Ledbetter sent his report to Botts and Greg Sappington, the NMSH personnel officer. Deanes, Botts, and Sappington met on July 2. Deanes was informed of the allegations against her and she denied abusing Doe. At this meeting, Deanes was given a pre-termination notice signed by Botts and Sappington. A pre-termination notice places an employee on administrative leave pending a final determination. Botts testified that she recommended terminating Deanes based on the "investigative report and our handbook." Sappington somewhat confusingly testified that he did not "personally recommend" terminating Deanes, but "based on the evidence, [had] no choice but to probably terminate her based on our policy." During the meeting, the possibility of Deanes resigning was discussed. There was also some mention of a videotape. However, when Deanes requested to view the tape, she was told she would have to subpoena the video. In reality, no tape existed due to a problem with the recording system. Deanes decided not to resign, and filed a

grievance asking for a formal termination hearing with Dr. Paul Callens, the Director of NMSH.

On July 13, 2009, Deanes, Callens, and Sappington participated in a pre-termination conference. Callens was the final decision maker regarding whether or not to terminate Deanes. At the conclusion of the hearing, Callens made the decision to terminate Deanes. Callens testified that he based his decision on Whitten's and Doe's statements (as relayed to him by Ledbetter's report) and that he did not believe Deanes' version of the events. NMSH ultimately issued a termination notice on July 13, 2009 signed by Callens.

On September 11, 2009, Deanes filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC determined that reasonable cause existed to believe that Deanes was discharged based on her race and issued a notice of right to sue. Deanes now brings the instant suit alleging she was terminated based on her race.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." Agnew v. Washington Mut. Fin. Group, LLC, 244 F. Supp. 2d 672, 675 (N.D. Miss. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002).

The Court is not to weigh the evidence or engage in credibility determinations. Anderson, 477 U.S. at 249, 106 S. Ct. 2505; Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir. 2009). "[T]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Deville, 567 F.3d at 164.

## DISCUSSION

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Plaintiff seeks to prove her case circumstantially, this Court applies the familiar framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination by establishing that (1) she was a member of a protected group; (2) she was qualified for the position she held; (3) she suffered an adverse employment decision; and (4) she was either replaced by someone outside her protected group or treated less favorably than employees not in her protected group. Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 513 (5th Cir. 2001).

Once plaintiff has made her prima facie case, the defendant has the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. Parker v. State of La. Dep't of Educ. Special Sch. Dist., 323 F. App'x 321, 327 (5th Cir. 2009). Defendant's burden at this stage is merely one of production—not persuasion. Id. If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, then the inference of discrimination created by the plaintiff's prima facie case disappears, and the plaintiff is left with the ultimate burden of proving intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). To meet this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate non-discriminatory reason is a pretext for discrimination. Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## I.     Prima Facie Case

Deanes is a member of a protected class, qualified for her position, experienced an adverse employment, and was replaced by a white employee. Plaintiff has established her prima facie case.

## II.     Legitimate, Non-Discriminatory Reason

NMSH asserts that it terminated Deanes for committing patient abuse, a Group III offense. NMSH has satisfied its burden. Therefore, the burden shifts back to the Plaintiff to demonstrate that Defendant's proffered reason is a pretext for discrimination.

## III.     Pretext

The job of a reviewing court conducting a pretext analysis is "not to engage in a second-

guessing of an employer's business decisions." LeMaire v. Louisiana Dep't of Transp. & Dev., 480

F.3d 383, 391 (5th Cir. 2007). In order to demonstrate pretext, the Plaintiff must do more than show

that NMSH made an incorrect decision; she must show that it made a discriminatory one. Id. The

issue at the pretext stage is whether the Defendant's reason, even if incorrect, was the real reason

for Plaintiff's termination. Sandstad v. C.B. Richard Ellis, Inc., 309 F.3d 893, 899 (5th Cir. 2002).

Even if Defendant's belief that Plaintiff had violated company policy was incorrect, this does not

demonstrate that Defendant's proffered reason for terminating Plaintiff was a pretext, nor does it

prove discrimination. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995).

Defendant's alleged error in relying on Whitten's statement and the "word of a mental

patient" over Deanes is insufficient to establish that Defendant lacked a good faith belief that

Plaintiff violated NMSH policy. Deanes argues that she has "produced overwhelming evidence that

the allegation of abuse is not credible," relying primarily on the discrepancies between Whitten's

deposition testimony and the statement he gave to Ledbetter and Gilmore after the incident.

However, "simply disputing the underlying facts of an employer's decision is not sufficient to create

an issue of pretext." LeMaire, 480 F.3d at 391. Similarly, the Fifth Circuit Court of Appeals has

observed that the "existence of competing evidence about the objective correctness of a fact

underlying a defendant's proffered explanation does not in itself make reasonable an inference that

the defendant was not truly motivated by its proffered justification." Little v. Republic Refining Co.,

924 F.2d 93, 97 (5th Cir. 1991) (citing Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1507 (5th

Cir.1988)).

In the case of Jackson v. Cal-Western Packaging Corp., 602 F.3d 374 (5th Cir. 2010), an

employee who was terminated over allegations of sexual harassment claimed his firing was a pretext

for age discrimination based in part upon his denial of committing any misconduct.  Id. at 379.  The Fifth Circuit explained:

> Jackson's self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact as to whether Cal-Western fired him because of his age. In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith.  Cal-Western was faced with considerable evidence that Jackson was violating the company's sexual harassment policy. The evidence came from several employees, both male and female, and was substantiated by both an internal and external investigation of Jackson's behavior. Jackson has presented no evidence as to why the company's reliance on the evidence against him was in bad faith.  His own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that Cal-Western's decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith.  Jackson's assertion of innocence alone does not create a factual issue as to the falsity of Cal-Western's proffered reason for terminating him.

Id. (footnotes, citations, and quotations omitted); see also Sandstad, 309 F.3d at 899 ("if Appellant intends to show that the explanation is so unreasonable that it must be pretextual, it is Appellant's burden to offer evidence creating a fact issue regarding reasonableness").

Here, Callens was presented with Ledbetter's investigative report which contained statements (as relayed by Ledbetter) from Whitten and Doe that Deanes had committed patient abuse by pushing Doe down on the couch.[3]  The fact that Whitten later backpedaled in his deposition testimony regarding whether he actually saw the alleged "push" has no bearing on whether NMSH unreasonably or in bad-faith relied on Ledbetter's summaries in the investigative report, or that it's

---

[3]Plaintiff argues that the statement from Doe contained in Ledbetter's report is hearsay. This would be true, and the statement likely inadmissable, if offered for the truth of the matter asserted.  However, the statement may be considered, not for its truthfulness, but for its effect on Defendant's decision.  Sandstad, 309 F.3d at 899.

reason for terminating Deanes was pretext for racial discrimination.[4]

Deanes also argues that similarly situated white employees were treated more favorably. Disparate treatment occurs where an employer treats one employee more harshly than other "similarly situated" employees for "nearly identical" conduct. See Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009). The "employee being compared must have 'held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.'" Brooks v. Lubbock Cnty. Hosp. Dist., 373 F. App'x 434, 436 (5th Cir. 2010) (quoting Lee, 574 F.3d at 260). Finally, Defendant must also have been aware of the alleged misconduct of the other employee. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001). Here, all of Deanes' putative comparators are either not similarly situated to Deanes, did not engage in "nearly identical" conduct, or both.

A.    Suzy Gildea

Deanes first alleges that Suzy Gildea, a white female, was insubordinate (a Group II offense) and used profanity towards a patient (a Group I offense), yet she was only reprimanded and forced to write a letter of apology. Gildea was also written up for a series of minor violations such as inappropriate telephone calls, a disheveled and unkempt "overall appearance," untimely work, and "not handl[ing] situations that come up in a professional manner." These offenses are not Group III offenses nor are they "nearly identical" to patient abuse. Therefore, Gildea's misconduct and

_____

[4]The Court also notes that it has been presented with no evidence that Whitten acted with racial animus when he reported seeing Deanes push the patient. Deanes stated that Whitten did not hold any animus against African-Americans "in general," but might have had disliked Deanes personally because she knew Whitten was allegedly having an affair with another employee. When asked how that connected to race, Deanes replied "I'm black and I'm a woman and he had something to be afraid of with me, so I'm connecting that to the race."

subsequent disciplinary measures are not probative as to whether NMSH discriminated against Deanes.

B.     Dustin Carter

Deanes next alleges that Dustin Carter, a white mental health technician, had a confrontation with a patient and elbowed him the mouth, causing the patient's mouth to bleed, yet Carter was not terminated. Deanes was the nurse on duty during the Carter incident and prepared the incident report herself. Deanes' report states: "Patient was being given a PRN injection. Patient began fighting, kicking and biting staff. Patient hit and spit blood on Dustin Carter's face. Also bit him on the shoulder. Employee went to the ER after incident." Deanes' report does not mention Carter hitting the patient and she checked "none" on the report regarding patient abuse. Deanes now claims that she did not remember Carter striking the patient while she was filling out the report, but remembered the event "[s]hortly after that." Deanes did not revise her report. When asked if the incident with Carter was patient abuse, Deanes responded "I did not see it as patient abuse at that time." Deanes' attempt to use the Carter incident to show discrimination when she herself reported that no abuse occurred is without merit.

C.     Robert Lewis

Deanes next alleges that "Robert Lewis broke the tooth of a patient during a take down." The only cited evidence is Deanes' deposition, where she testified:

> Q:     Tell me about the Robert Lewis incident
> A:     This was hearsay. I heard that he had broken a tooth of a patient during a take-down.
> Q:     Who told you this?
> A:     Other employees were discussing it.
> Q:     Who were the employees?
> A:     I don't remember who they were at the time.
> Q:     And when did you hear about this?
> A:     At work.

This allegation is based on hearsay and fails to establish that Lewis was similarly situated to the Plaintiff or engaged in nearly identical conduct.

D.    Kathy Gilmore

Deanes alleges that "Kathie Gilmore committed an offense by allowing a security guard to administer medication to a patient." The only evidence Deanes provides is an unsigned document entitled "Telephone interview with CP," which is presumably an EEOC investigator's notes of a telephone conversation he or she had with Deanes. The document states "According to the 'grapevine,' Gilmore allowed a security guard to administer medication to a patient." This allegation is based on hearsay and fails to establish that Gilmore engaged in conduct "nearly identical" to patient abuse.

Deanes also alludes to several other incidents that she claims demonstrates racial discrimination. Deanes asserts that when she and a black nurse attempted to sign up for a continuing education class, Botts told Deanes that she could not go. However, when two white nurses expressed interest in the class, Botts allowed all of them to attend. The only record evidence cited regarding this incident is the above referenced document entitled "Telephone Interview with CP" which consists of an EEOC investigator's notes of the Plaintiff's own unsworn statements. Moreover, in response to NMSH's argument that the same-actor inference should apply to Botts, Deanes argues that "Botts did not fire Deanes" and "after the first pre-termination meeting, Botts had no involvement with Deanes' termination."

Deanes also cites her own deposition testimony regarding statements allegedly made by Terry Miller, the former Director of Human Resources for NMSH. Miller resigned several months

prior to Deanes' termination.[5]  Deanes contacted Miller after her first meeting with Botts and

Sappington.  Deanes asserts that Miller told her that "[i]t was the standard practice while we were

working there that blacks that were given a pre-termination notice were generally terminated."

Again, these statements are hearsay and not competent summary judgment evidence.  Miller did not

testify about this practice in his own deposition.[6]

Finally, Plaintiff points out that the EEOC determined that reasonable cause existed to

believe that Plaintiff was discharged based on her race.  Although an EEOC determination may be

probative of discriminatory intent, it is not dispositive.  Price v. Fed. Express Corp., 283 F.3d 715,

725 (5th Cir. 2002).  The relevant portion of the determination provides:

> Evidence obtained by the Commission revealed Charging Party was hired in May
> 2008 as a Registered Nurse and worked with an unblemished employment history
> until her discharge in July 2009.  The investigation revealed Charging Party was
> treated less favorably than similarly situated White employees who violated
> company policy.
>
> The evidence revealed Charging Party was accused of patient abuse after she utilized
> an approved restraining technique after a patient became combative and aggressive.
> It is undisputed that the patient displayed escalating aggressive behavior throughout
> the day in question.  The decision to discharge Charging Party was based on
> contradictory evidence and without the investigating official discussing the matter
> with her.  Comparative evidence revealed White employees where accused of patient
> abuse who were not discharged.  In addition, information uncovered during the
> course of the investigation revealed another Black employee who was given the
> ultimatum to resign or be discharged after she was accused of violating company
> policy.[7]  Disparate treatment was shown when similarly situated White employees
> were not given the same ultimatum under similar circumstances.

---

[5]Defendant asserts that Miller resigned in lieu of termination after it was determined that
he received his college degree from a "diploma mill."

[6]While Miller testified that he believed Botts had a unethical practice of "weeding out
people," he stated he not believe that it was race based.

[7]The identity of the other black employee is unclear.

Based on this analysis, the evidence is sufficient to conclude that Charging Party and another Black employee were discharged because of their race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended.

The Court has already determined that Plaintiff has failed to identify any similarly situated white employees who were treated more favorably that the Plaintiff. Therefore, the determination letter is insufficient to carry Deanes' pretext burden. See Septimus v. Univ. of Houston, 399 F.3d 601, 610 (5th Cir. 2005) (EEOC determination was not sufficient to meet plaintiff's pretext burden when plaintiff failed to rebut defendant's legitimate reason for the adverse employment action). In sum, Plaintiff has presented no evidence that her race played any role in NMSH's decision to terminate her. Accordingly, NMSH's Motion for Summary Judgment is GRANTED as Plaintiff failed to raise a genuine dispute of material fact that Deanes was terminated because of her race.

## CONCLUSION

Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's claims are dismissed, and this case is CLOSED.

SO ORDERED on this, the 26th day of March, 2013.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**